VAN CLEVE HOTEL COMPANY, IN RE, RESPONDENTS.

The Ohio Civil Rights Commission

No. 1.  Decided January 3, 1962.

COMMISSION ORDER, FINDINGS
OF FACT, AND REASONS

On the basis of the record we find no ground for taking further testimony or hearing further argument. We concur in the findings of fact, conclusions of law, and the opinion of the Hearing Examiner, which are made a part hereof. We deem it appropriate to comment on the thorough and acute analysis of the evidence by Dean Barrow, for the record is lengthy and contains its share of vague and conflicting testimony.

We see no purpose in adding to the discussion contained in the opinion of the Hearing Examiner, with which we concur in full. Without detracting from other reasons, we are particularly convinced by the efforts of Respondent Taylor to fill the position of bass violin player for the Lamplighters during their engagement at the Van Cleve Hotel while at the same time, and in the same room, Lester Bass, one of the most talented bass violinists in the area, was seeking employment. There is no convincing reason for the failure to refer him for this position except discrimination. There is no evidence in the record that such discrimination was requested by any representative or agent of the Van Cleve Hotel.

ORDER

1. The Commission finds that respondent, the Van Cleve Hotel Company, has not engaged in any unlawful discriminatory practices within the meaning of Sections 4112.01 to 4112.08, inclusive, Revised Code, and as to this respondent the complaint is dismissed.

2. IT IS HEREBY ORDERED that respondent Carl Taylor pay to complainant Lester Bass $180, the amount of the net salary to which he would have been entitled had he been permitted to perform with the Lamplighters during the engagement at the Van Cleve Hotel, plus interest at 6% per annum from March 27, 1961.

IT IS FURTHER ORDERED that respondent Carl Taylor forthwith cease and desist from discriminating against any person on the basis of race, color, national origin or ancestry in the acceptance, registration, classification or referral of persons for employment, or otherwise discriminating against

any person contrary to the Ohio Fair Employment Practices Act.

January 3, 1962

By the Commission
Richard E. Guggenheim
CHAIRMAN

OPINION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND RECOMMENDATIONS

OPINION

On March 27, 1961, complainant Lester Bass, a Negro musician residing in Dayton, Othio, filed with the Ohio Civil Rights Commission a charge against the Van Cleve Hotel Company, Dayton, Ohio, and Karl Taylor Orchestras and Entertainment, Dayton, Ohio, respondents in this case. In substance, complainant charged that, because of his race and color, respondents had denied him an opportunity to perform with the musical group with which he regularly performed, the Lamplighters, during an engagement at the Van Cleve Hotel. After investigation and conciliatory endeavors, the Commission issued a complaint alleging that respondents have engaged in unlawful discriminatory practices in violation of the Ohio Fair Employment Practices Act.

The provisions of FEPA on which the complaint is based are subsections (A), (B) and (H) of Section 4112.02, Revised Code, reading as follows:

"Section 4112.02, Revised Code. It shall be an unlawful discriminatory practice:

"(A) For any employer, because of the race, color, religion, national origin or ancestry of any person, to refuse to hire or otherwise to discriminate against him with respect to hire, tenure, terms, conditions or privileges of employment, or any matter directly or indirectly related to employment.

"(B) For an employment agency, because of race, color, religion, national origin, or ancestry to:

"(1) Refuse or fail to accept, register, classify properly, or refer for employment, or otherwise to discriminate against any person;

"(2) Comply with a request from an employer for referral of applicants for employment if the request indicates directly or indirectly that the employer fails to comply with the pro-

visions of Sections 4112.01 to 4112.07, inclusive, Revised Code.

＊　　　　＊　　　　＊　　　　＊

"(H) For any person to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of Sections 4112.01 to 4112.07, inclusive, Revised Code, or any order issued thereunder, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice."

The complaint alleged, in substance, that respondent Van Cleve Hotel Company requested that complainant, because of his race and color, be excluded from the Lamplighters during an engagement at the Van Cleve Hotel; that respondent Karl Taylor, who conducts an entertainment agency, either in compliance with this request or on his own initiative, referred the Lamplighters, exclusive of complainant, to the Van Cleve Hotel, complainant having been excluded because of race and color; and that, as a result of the unlawful discriminatory practices, complainant was deprived of employment during the engagement of the Lamplighters at the Van Cleve Hotel, from March 13, 1961 through March 26, 1961, inclusive, and in the succeeding engagement of the Lamplighters at the Galaxy Club, Dayton, Ohio, which employed the group as it was constituted during the engagement at the Van Cleve Hotel, for a period beginning on March 29, 1961, and lasting at least ten weeks.

Upon due notice, a hearing was held in Dayton, Ohio, on September 6, 7 and 14, 1961, before a hearing examiner appointed by the Commission.

### A. Karl[1] Taylor dba Karl Taylor Orchestras and Entertainment.

The complaint alleged that, either in compliance with a request of the Van Cleve Hotel or on his own initiative, respondent Karl Taylor referred the Lamplighters for an engagement at the Van Cleve Hotel, complainant Bass being excluded therefrom because of race and color.

FEPA makes it an unlawful discriminatory practice for an employment agency to refuse or fail to refer for employment,

---

1. Taylor's given name is "Carl." However, his business name is "Karl" Taylor.

or to comply with a request from an employer for referral of, any person because of race or color. Respondent Karl Taylor is in business as an entertainment agency. As such, he refers musicians to band-leaders and refers musical bands to establishments desiring entertainment. Respondent Taylor is an "employment agency" within the meaning of FEPA.

During the past fifteen years, approximately, no Negro musician has performed in the public rooms at the Van Cleve Hotel. In his years of service as an entertainment agency, respondent Taylor had never, prior to the matter involved in this case, referred to the Van Cleve Hotel, for performance in the public rooms, a Negro orchestra or an orchestra in which any Negro performed. The Lamplighters are a four-man band, of which the leader is Mr. Lee Hoppel and the side-men, at the time of the events leading to the complaint herein, were Mr. William Davis, Mr. Philip Kelly and Mr. Lester Bass, the complainant. Bass was the only Negro member of the band and played the bass violin. Karl Taylor has served as a booking agent for the Lamplighters since the organization of the group two years ago. Early in March 1961, Taylor referred the Lamplighters to the Van Cleve Hotel for a two-week engagement in the Mayfair Room. In connection with this engagement, the band-leader, Hoppel, substituted a white musician for complainant Bass, a Negro. The main issue in the complaint, insofar as it pertains to respondent Taylor, is whether Taylor, in referring the Lamplighters to the Van Cleve Hotel, arranged for or contributed to the exclusion of complainant, or refused or failed to refer complainant for employment because of complainant's race or color.

Some observations about respondent Taylor's race relations should, in fairness to him, be made. He is booking agent for Negro musicians and mixed racial groups as well as all-white orchestras. He is booking agent for the Lamplighters, a mixed group at the time of the events involved here. There is no question that respondent Taylor has referred and will refer Negro bands and mixed racial bands wherever he believes they can be placed. As an orchestra leader, he used Negro as well as white musicians. Complainant Bass testified at the hearing that he did not consider that Taylor had discriminated against him but that the Van Cleve Hotel had. It seems clear that respondent

Taylor is personally a tolerant man of good will toward all races. A beneficial effect of FEPA is that it gives a person who does not desire to discriminate a strengthened basis for refusing to do so. If Taylor refused or failed to refer a Negro musician it was because he was of the opinion that a Negro musician would not be acceptable to the establishment where the music was to be performed. Nevertheless, if he refused or failed to refer a Negro musician on such ground, this constituted a violation of FEPA. A Civil Rights Statute is concerned with whether there has been discrimination on the basis of race or color and not with the motivation of the discrimination.

(1) *The substitution of a white musician for complainant.*
Early in March 1961, the Lamplighters obtained an engagement of two weeks, with mutual option, at the Wishing Well in Richmond, Indiana. The proprietor notified Hoppel, the band-leader, that the option would not be exercised. On Monday, March 6, 1961, Hoppel called Taylor to inform him that the option had not been exercised and to inquire whether there were other openings.

On Tuesday, March 7, Taylor called Hoppel and advised that the Lamplighters could obtain an engagement at the Van Cleve Hotel. Hoppel had played at the Van Cleve from time to time for several years and had noted that Negro musicians were not used in the public rooms at the Van Cleve. In the conversation with Taylor on March 7, Hoppel asked Taylor whether he had ever booked Negro entertainers at the Van Cleve. Taylor replied that he had not and that he did not know of any Negroes having been booked. Hoppel concluded from Taylor's statement that Bass would not be acceptable to the Van Cleve because of his race and color.

On Tuesday evening, March 7, when the Lamplighters met at the Wishing Well for their evening performance, Hoppel told the Lamplighters that there was a possibility of an engagement at the Van Cleve. He informed complainant that he would not be able to join the group during the Van Cleve engagement. Complainant asked why and Hoppel replied that he could not use complainant at the Van Cleve because of his race and color. Hoppel gave the same explanation to other members of the band. Hoppel was not happly with the impending en-

gagement. On Tuesday night, March 7, Hoppel went to Ft. Wayne, Indiana, to investigate a lead but was not successful in obtaining an engagement for the group.

There was a further conversation between Taylor and Hoppel on Wednesday, March 8, in which Taylor instructed Hoppel to stop at the Van Cleve Hotel and sign the contract. Hoppel signed the contract later that day. During this conversation,[2] Taylor stated to Hoppel that Hoppel knew the type of music desired at the Van Cleve, that Hoppel knew "what kind of group" Hoppel had at the time of an audition at the Van Cleve in October 1960, and that the Manager of the Van Cleve would like Hoppel to bring that group "intact" if possible, except that he did not desire the blind, bass violin player. At the time of the audition referred to, complainant was not a member of the Lamplighters, the bass violin player being a blind, white musician. However, Taylor knew that Bass was a member of the group in March 1961. Taylor testified that, in the conversation reported above, he was concerned only in assuring the type of music desired in the Mayfair Room, which is "commercial society" music. Hoppel testified that to him Taylor's suggestion that he get "the same group" that was auditioned, coupled with Taylor's statement that he had not referred any Negro musicians to the Van Cleve and knew of none having been booked, meant that the Van Cleve did not want Negro musicians and it was necessary to substitute a while musician for complainant. Hoppel requested that Taylor refer another bass player and Taylor suggested to Hoppel that he use Tommy Van Tillberg on the bass violin.[3] Hoppel testified that complainant was a better performer on the bass violin than Van Tillberg and that he had no reason, other than the assumption that a Negro musician was not acceptable to the Van Cleve, for not using complainant in the Van Cleve engagement. Hop-

---

2. There is a conflict in the testimony as to whether the statement was made in this conversation or in that between Taylor and Hoppel on March 7. It is unnecessary to resolve the conflict.

3. Another member of the Lamplighters, Mr. Philip Kelly, percussionist, also did not play with the Lamplighters during the Van Cleve engagement. Kelly is white. He had had an altercation with the Manager of the Van Cleve Hotel when performing there during a prior engagement and did not desire to perform in this engagement.

pel testified to the effect of Taylor's recommendation, as follows: "* * * [He] suggested other bass players, and from this * * * I assumed that I could not take Mr. Bass in. * * * I had a bass player, and why should you recommend other bass players if I had a bass player." Hoppel told Taylor that he would offer the job to Van Tillberg. Hoppel called Van Tillberg on Thursday morning, March 9, and Van Tillberg accepted. Hoppel then reported this to Taylor.

The legal import of the substitution of a white musician, Tommy Van Tillberg, for the Negro musician, complainant Bass, is considered hereinafter.[4]

(2) *Failure to refer complainant to fill the vacancy created by Van Tillberg's withdrawal.*

On Friday morning, March 10, Van Tillberg requested that Hoppel release him to accept a position with another band which was making a tour. Later that day, Hoppel called Taylor for the dual purpose of arranging a meeting for complainant Bass and William Kelly, who were seeking employment, and of obtaining a bass violin player to replace Van Tillberg. Taylor suggested that Hoppel call Berny Edwards, a band leader who had been using a substitute during the illness of his regular bass violin player, to ascertain whether the substitute was available. Hoppel arrived at Taylor's, with Bass and Kelly, about 1:30 or 2:00 p. m. on Friday, March 10, and they remained

---

4. The Commission's Northwest Regional Director, Mr. Jerry Belenker, testified regarding an interview on April 6; 1961, of Hoppel conducted by Mr. Robert Coates and Belenker, in which Hoppel attributed to Taylor a statement that the complainant was not acceptable to the Van Cleve Hotel because he is a Negro. Coates, the Commission's Southwest Regional Director, did not testify because the hearing examiner ruled that there should be a separation of witnesses and the Commission needed the service of Coates in presenting its case. Belenker testified that he asked Hoppel whether he would consider himself under oath and that Hoppel replied, "Yes.". Belenker is an attorney and a notary public and has authority to administer oaths. Belenker asked why Bass was replaced. Hoppel replied that Taylor had told him that the Manager of the Van Cleve Hotel had told Taylor that he did not wish a Negro musician performing at the Van Cleve and for this reason Hoppel had replaced Bass. Hoppel told Belenker that his conversation with Taylor took place at a meeting at Taylor's home attended also by complainant and William Kelly and it was at this meeting that Taylor recommended Tommy Van Tillberg. However, the weight of the evidence establishes that Van Tillberg had

about two hours.[5] During this conference, Taylor called a number of band leaders and club owners regarding Bass and Kelly and he tried to place Bass with Berny Edwards' band. At this conference, Hoppel's need for a bass violin player was again mentioned and Taylor again suggested that Hoppel call Berny Edwards. Edwards, in turn, recommended John Mapp, a white, bass violin player.

Taylor and Hoppel testified that there was no discussion, during the conference in Taylor's home on March 10, of the reasons why Bass could not perform with the Lamplighters during the Van Cleve engagement. Bass testified that he asked Taylor why he could not perform at the Van Cleve and Taylor explained that the Van Cleve would not accept a mixed racial group. Kelly's testimony confirmed Bass' testimony on this point. In a number of particulars, the recollections of Bass and Kelly regarding events involved in this case, including this conference, are not borne out by the hearing. It is deemed unnecessary to resolve this conflict in the testimony. The conference was for the dual purpose of finding employment for the regular bass violin player of the Lamplighters, who was a Negro, and to find a bass violin player for the Lamplighters. Taylor and Hoppel knew that Bass could play "commercial society" music capably. Yet, he was not given the vacancy resulting from Van Tillberg's withdrawal.

---

been hired on Thursday, March 9, and the meeting at Taylor's home occurred on Friday, March 10.

At the hearing, Hoppel admitted that in the interview by Coates and Belenker he agreed that he would assume that he was under oath. He testified, at the hearing, that while he might have told Coates and Belenker that Taylor expressly cited Bass' race as the basis for exclusion, he did not recall telling them this and, in any event, it was only an assumption on his part.

It is not necessary, for purposes of this case, to determine whether Hoppel was under oath when he was interviewed by Coates and Belenker or to resolve the conflicting testimony. Hoppel admits that he agreed to consider that he was under oath and his statements so made are entitled to more than the usual weight. However, this testimony of Belenker serves primarily to impeach Hoppel's testimony. As such, it does not add substantial affirmative weight to the Commission's case. Moreover, at this stage of the investigation Hoppel was subject to a possible complaint by the Commission and this may have colored his explanation of his replacement of complainant.

5. During this meeting, Hoppel delivered to Taylor a copy of the signed contract for the Van Cleve engagement.

Upon the invitation of Hoppel, on Friday evening, March 10, John Mapp, a white bass player, and David Schierloh, a percussionist, "sat in" with the Lamplighters at the Wishing Well. The purpose was to audition them. Although Hoppel had not heard them play previously, they played only 40 minutes, and the music played during the audition was not "commercial society" music but "commercial jazz," he hired Mapp and Schierloh that evening for the Van Cleve engagement.

Hoppel testified that Mapp and Schierloh asked him why he needed a bass violin player and he explained that his bass player was colored and could not be used at the Van Cleve because of his race.

Hoppel and other witnesses compared the musical ability and experience of Bass and Mapp. All agreed that, while Mapp is well qualified, Bass is better qualified. Bass has played with name bands throughout the United States and on some tours abroad. He has written and arranged music as well as performing. Hoppel admits and Taylor must have known that Bass could perform commercial society music very well.

The legal implication of the failure to refer complainant Bass as a replacement for Van Tillberg is considered hereinafter.

(3) *Application of the FEPA.*

Section 4112.02 (B) (1), Revised Code, makes it an unlawful discriminatory practice for an employment agency to refuse, or fail, to refer for employment any person on the basis of race or color. When respondent Taylor talked to the band leader, Hoppel, regarding the Van Cleve engagement, Hoppel inquired whether Negro musicians were accepted at the Van Cleve. Taylor knew that Hoppel desired to keep the band intact and that the inquiry was for the purpose of ascertaining whether Bass, the Negro bass violin player, could be included in the group. Taylor has not referred a Negro band or mixed racial band to play in the public rooms at the Van Cleve in his entire period of service as an entertainment agency. Hoppel had played at the Van Cleve from time to time for years and had not seen a Negro musician playing there. In such circumstances, a subtle suggestion was enough to secure Bass' exclusion. Absent discrimination, the appropriate action for an entertainment agent to have taken was to recommend Bass' continuation in

the group. Instead, Taylor answered Hoppel that he had never referred any Negro musicians to the Van Cleve for performances in the public rooms and did not know of any having been used at the Van Cleve. Taylor further told Hoppel that he should bring "intact" the group which had been auditioned by the Van Cleve several months previously, except for the blind, bass violin player and the percussionist, with whom the Manager of the Van Cleve had had differences when the percussionist played there previously. Thus, Taylor was asking Hoppel to bring "intact" only two musicians, Hoppel and Davis. In the light of this, Taylor's testimony that he suggested bringing in "the same group" only because he was interested in the type of music to be played, loses some degree of credibility. If the Van Cleve did not desire the blind, bass violin player, who had been auditioned, what would be more reasonable, absent discrimination, than to use the regular bass violin player of the Lamplighters as of the time involved here, complainant Bass? But Taylor had never referred a Negro musician to the Van Cleve and the Hotel had not used one in the public rooms for fifteen years. Hoppel "assumed" from Taylor's statements that he would not obtain the Van Cleve engagement unless he replaced the Negro member of the band. The "assumption" was hardly unreasonable. His request for referral of another bass player was met with a ready response from Taylor. Understandably, when Hoppel, having an "excellent" bass player, received a recommendation of another bass player, Van Tillberg, he concluded that it was not possible to obtain the engagement unless the Negro member were replaced. While Hoppel did not consider Van Tillberg equal to Bass, he substituted Van Tillberg for the Negro. It must be recognized that Taylor was not a mere by-stander in the substitution of the white musician for the Negro musician. He contributed to it materially and substantially. This was a failure to refer a person for employment because of his race or color.

Let us assume that Hoppel had come to Taylor and requested Taylor to refer a bass violin player but not to refer any Negro, and Taylor had complied. Clearly this would be a violation. It is no less a violation if a band leader, having a Negro musician, asks for advice as to whether a Negro is acceptable to the club or hotel employing the band and the em-

ployment agency advises that a Negro is not acceptable and recommends a white musician in his place. Respondent Taylor, in contributing to the substitution of a white musician for a Negro musician, committed an unlawful discriminatory practice in violation of Section 4112.02 (B), Revised Code. ·

Respondent Taylor had a second opportunity to refer complainant for employment when Tommy Van Tillberg, the first white bass violin player whom Taylor recommended and Hoppel employed as a replacement for complainant, withdrew. Hoppel again asked the employment agency for a referral. The circumstances in which Hoppel made the request should be noted well. Complainant had been excluded from the band for the duration of the Van Cleve engagement. Hoppel now needed a bass violin player to replace the white bass violin player whom Taylor had recommended as a replacement for the Negro bass violin player. Complainant was unemployed and Taylor was his booking agent. Hoppel called Taylor for a dual purpose: (a) to seek a job as bass violin player for complainant, and (b) to seek a bass violin player for Hoppel for the duration of the engagement at the Van Cleve. Taylor might have killed two birds with one stone, by suggesting that Bass assume his regular position with the Lamplighters during the Van Cleve engagement. Instead, Taylor recommended that Hoppel contact Berny Edwards, an orchestra leader, and seek Edwards' substitute bass violin player. And Taylor sought to place complainant with the same Berny Edwards. The substituted white bass violin player, John Mapp, while a competent musician, was not as well qualified as complainant. Hoppel had never heard Mapp play but hired him after about forty minutes' audition, during which "commercial jazz," rather than the "commercial society" music required at the Van Cleve, was played. Thus, respondent Taylor again failed to refer complainant for employment because of his race and color, in violation of Section 4112.02 (B), Revised Code.

Hoppel was not made a respondent in the case.

B. *The Van Cleve Hotel Company.*

The complaint alleged that the respondent Van Cleve Hotel Company requested that complainant not be included in the Lamplighters during the engagement of the Lamplighters at the Van Cleve.

The Van Cleve Hotel has not used a Negro orchestra or a Negro musician in the public rooms at the Van Cleve for approximately fifteen years. Negro entertainers are used in private rooms at the Van Cleve. Of 37 waiters and waitresses, two are Negroes and a very high percentage of the menial employees are Negroes. The Hotel is frquently selected as a convention headquarters by Negro and mixed-racial groups. The two public rooms in which entertainment is provided are the Redwood Room and the Mayfair Room. The Lamplighters were engaged to play in the Mayfair Room. The entertainment provided in the Mayfair is dinner music and supper dancing music. The type of music used is "commercial society."

Mr. Claude Cannon, Vice President and Manager of the Van Cleve Hotel, selects the entertainment for the public rooms in the Van Cleve. Cannon testified that he does not follow a policy of excluding Negro musicians from the public rooms. He explained that the lack of Negro musicians in the public rooms was due to the fact that "commercial society" music is used and the groups which play this type of music usually do not include Negroes. So far as he knows, no mixed racial group has ever been referred to him. He stated that 90 per cent of out-of-town bands are booked without knowledge of the racial composition of the bands and that the advertising circulars do not mention race.

Regarding the engagement of the Lamplighters, Cannon testified as follows: When the Lamplighters were engaged he did not know who the members of the band were or what their race was. Taylor did not advise him who was in the band and he did not advise Taylor to exclude Negroes. He never spoke to Hoppel regarding the racial composition of the band. If the Lamplighters had been referred with Bass as a member, Bass would have been permitted to play in the public rooms at the Van Cleve.

Taylor testified as follows: Neither Cannon nor any other employee of the Van Cleve had instructed him to exclude mixed racial groups and that he was not instructed to exclude Bass from the Lamplighters. He did not advise Cannon of the racial composition of the Lamplighters or of any personnel changes made in connection with the engagement at the Van Cleve. Cannon did not suggest Van Tillberg as a replacement.

Hoppel testified as follows: Cannon did not speak to Hoppel regarding this engagement. Cannon did not ask him to replace Bass or not use a Negro musician during the Van Cleve engagement. Hoppel assumed from Taylor's statement that Bass was not acceptable to the Van Cleve.

Mapp, Kelly, and Davis, who testified that Hoppel said Bass could not play at the Van Cleve because of his race, testified that Hoppel did not attribute this to Cannon or any other employee of the Van Cleve.

During the interview of Hoppel on April 6, 1961, by Belenker and Coates, Hoppel said that Taylor told Hoppel that Cannon told Taylor that Cannon did not want a Negro musician in the public rooms at the Van Cleve. This statement, in addition to the weakness of "third degree" hearsay, was introduced for purposes of impeaching Hoppel's testimony and does not contribute substantially to the Commission's case against the Van Cleve. Also, respondent Taylor was interrogated during the hearings regarding conferences with members of the Commission's staff. Taylor denied that in these conferences he had stated that Cannon suggested the substitution of Van Tillberg for Bass or otherwise related Cannon to the matters involved in this case.

The great weight of the evidence adduced in the hearing is that respondent Van Cleve Hotel Company did not request that complainant be excluded from the Lamplighters during the engagement at the Van Cleve Hotel. The evidence shows that respondent Taylor was of the opinion that the Van Cleve did not desire a mixed racial group performing in the public rooms and that he, in concert with Hoppel, the band leader of the Lamplighters, substituted a white musician for the Negro musician, complainant Bass, to satisfy an assumed prerequisite to acceptance of the group by the Van Cleve.

## C. Consequential loss of employment at the Galaxy Club.

The complaint alleged that, as a result of respondent Taylor's discriminatory practice in refusing or failing to refer complainant for the engagement at the Van Cleve Hotel, complainant was also deprived of employment with the Lamplighters during the succeeding engagement of the Lamplighters

at the Galaxy Club in Dayton, Ohio, and that the complainant suffered loss of salary during this engagement.

Mr. Charles D. Krandall, part owner of the Galaxy Club, testified regarding his employment of the Lamplighters as follows: Krandall attended a performance of the Lamplighters during their engagement at the Van Cleve Hotel. He liked the performance and booked the group for the Galaxy Club. He testified that if Bass, rather than Mapp, had played the bass violin and had played it as well as Mapp did, he would have hired the group and that it would have made no difference that Bass was a Negro. The Galaxy Club does employ mixed racial groups for its entertainment. The testimony of Hoppel and others was that Bass is a better musician than Mapp. Krandall paid Hoppel $400 per week for the service of the group. The group came to the Galaxy promptly after the Van Cleve engagement, which ended March 26, and performed at the Galaxy Club three months.

The hearing showed that the personnel of the Lamplighters changes frequently. Hoppel testified that during the engagement of the Lamplighters at the Galaxy Club, the drummer was changed twice, the piano player once and the bass violin player once. At the time of the hearing and during much of the period of the engagement at the Galaxy Club, there was no member of the Lamplighters, with the exception of the band leader, who constituted the group which played at the Van Cleve Hotel. It will be recalled that, at the time that the Lamplighters moved from the engagement at the Wishing Well to the engagement at the Van Cleve, two members of the four-member band were changed.

The FEPA confers on the Commission broad remedial authority. Paragraph (G) of Section 4112.05, Revised Code, provides that, if the Commission determines that a respondent has engaged in an unlawful discriminatory practice, it "shall issue * * * an order requiring such respondent to cease and desist from such unlawful discriminatory practice and to take such further affirmative or other action as will effectuate the purposes of" FEPA "including, but not limited to hiring, reinstatement, or upgrading of employees with, or without, back pay, admission or restoration to union membership, including a requirement for reports of the manner of compliance." Com-

menting upon the remedial authority under the FEPA of the State of New York, the Court of Appeals of New York has stated: "'The Executive Law authorizes that body to devise remedies which it deems appropriate to 'effectuate' the legislative policy against discrimination and to prevent future violations by a proven transgressor. * * * The Commission * * * 'has wide discretion in its choice of a remedy deemed adequate to cope with the unlawful practices' in question, 'and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.' '"[6] (Citing cases.)

No case has been found involving the issue—involved in this case—of whether Civil Rights Commissions under FEPA laws have remedial authority to extend a back-pay award to consequential loss of employment in an engagement succeeding the engagement relative to which the unlawful discriminatory practice occurred. This is in the nature of consequential damages and goes beyond the non-exclusive examples of remedies specified in paragraph (G), quoted above.

Assuming that the Commission has authority to extend the back-pay award to a consequential loss of employment following the employment relative to which the discrimination occurred, it is not deemed an appropriate remedy under the circumstances of this case. Although he had performed from time to time with Hoppel for several years, complainant first performed with the Lamplighters in November 1960. He performed for only a period of four months with the group. Half the membership of the Lamplighters was changed when the group began the Van Cleve engagement. A complete turnover of personnel, except the band leader, occurred during the engagement at the Galaxy Club. The engagement of the Lamplighters at the Van Cleve Hotel was only two weeks and that at the Galaxy Club was three months. Thus, allowance of consequential damages would be disproportionate to the loss of salary resulting from the discrimination in employment during the engagement at the Van Cleve. The FEPA states that the Commission's remedies may include or exclude back-pay. In the round, the award of back-pay in this case should not include the consequential loss of

---

6. *Holland* v. *Edwards*, 307 N. Y. 38, 119 N. E. 2d 581, 585 (1954).

salary during the engagement of the Lamplighters at the Galaxy Club.

### D. *Rulings on Motions.*

During the hearing, objections were raised to the admission of testimony to an extent rendering the conduct of the hearing difficult. This resulted in part from the hearing examiner's ruling that hearsay testimony was admissible[7] and in part from respondents' desire to protect their position in the light of Section 4112.06 (C), Revised Code, which provides that "An objection that has not been urged before the Commission shall not be considered by the Court, unless the failure or neglect to urge such objection is excused because of extraordinary circumstances." Respondents requested that they be given standing objections on the basis of hearsay, immateriality and irrelevancy. While inviting respondents to make objections where the basis was immateriality or irrelevancy, respondents' requests were, in the interest of keeping the record and hearing within bounds, granted. Various objections were thereafter made and ruled upon. Except in those instances on the record in which specific objections were ruled upon the standing objections, after analysis of the record, are overruled. In this connection, it may be noted that the evidence on the basis of which respondent Taylor has been found in violation of FEPA is substantially the testimony of respondent Taylor and the band leader, Hoppel, both of whom were called by respondent Taylor.

### FINDINGS OF FACT

1. Lester Bass is a resident of Dayton, Ohio, Karl Taylor dba Karl Taylor Orchestras and Entertainment, is a resident of and operates an entertainment agency in Dayton, Ohio, and the Van Cleve Hotel Company has its offices and operates a hotel business in Dayton, Ohio.

2. On March 27, 1961, Lester Bass, a Negro, filed with the Commission a charge that the Van Cleve Hotel Company and Karl Taylor Orchestras and Entertainment had denied him the

---

7. Section 4112.05 (E) of the Ohio Revised Code states that the hearing examiner "shall not be bound by the rules of evidence prevailing in Courts of law or equity, but shall * * * take into account all evidence, statistical or otherwise, which may tend to prove a predetermined pattern * * *."

opportunity to perform with a musical group with which he was then employed, the Lamplighters, during an engagement at the Van Cleve Hotel, because of his race and color.

3. Complainant Lester Bass is a capable, experienced performer on the bass violin, plays most types of music including "commercial society" music, has written and arranged music, has played with name bands throughout the United States and abroad, and was the regular bass violin instrumentalist for a group known as the Lamplighters beginning in November 1960.

4. The Lamplighters are a four-man band, of which the leader is Lee Hoppel and the members, at the time of the events leading to the complaint, were William Davis, Philip Kelly and Lester Bass.

5. Respondent Karl Taylor, dba Karl Taylor Orchestras and Entertainment is an entertainment agency and, as such, refers musicians, including complainant, to band-leaders and refers bands, including the Lamplighters, to hotels and clubs desiring entertainment. Respondent Taylor is an "employment agency" within the meaning of FEPA.

6. The Van Cleve Hotel Company has two public rooms, the Redwood Room and the Mayfair Room, the entertainment provided in the Mayfair Room is dinner music and supper dancing music, and the type of music used is "commercial society."

7. During the past fifteen years, approximately, no Negro musician has performed in the public rooms of the Van Cleve Hotel.

8. Karl Taylor had never, prior to the events leading to the complaint herein, referred a Negro orchestra or an orchestra including a Negro musician to perform in the public rooms of the Van Cleve Hotel.

9. On March 7, 1961, Taylor advised Hoppel, whose current engagement at the Wishing Well, Richmond, Indiana, was terminating, that the Lamplighters could obtain an engagement at the Van Cleve Hotel. Hoppel asked Taylor whether he had booked Negro musicians at the Van Cleve and Taylor replied that he had never booked any and he did not know of any having been booked.

10. On the evening of March 7, 1961, Hoppel informed the Lamplighters that there was a possibility of an engagement

at the Van Cleve Hotel, but that Bass would not be able to perform during this engagement because of his race and color.

11. Later in the evening of March 7, 1961, Hoppel went to Ft. Wayne, Indiana, in the hope of obtaining an engagement for the Lamplighters but was unsuccessful.

12. On March 8, 1961, Taylor called Hoppel and stated that Hoppel should stop at the Van Cleve Hotel and sign the contract; that Hoppel knew the type of music desired at the Van Cleve Hotel; that Hoppel knew "what kind of group" Hoppel had when the Lamplighters were auditioned by the Van Cleve in October 1960; and that the manager of the Van Cleve desired Hoppel to bring that group "intact" to the extent possible, except that he did not want the blind musician who was the bass violin player at the time of the audition in October 1960.

13. Hoppel asked Taylor for referrals and Taylor recommended Tommy Van Tillberg as a bass violin player.

14. Hoppel interpreted Taylor's statement that he had not referred any Negro musician and knew of none having been booked at the Van Cleve, his advice that he bring intact the group auditioned in October 1960—which excluded Bass, except for the blind, bass violin player, and the referral of Tommy Van Tillberg to play the bass violin, to mean that complainant Bass was not acceptable to the Van Cleve Hotel because of his race and color.

15. Hoppel rated Bass a better bass violin player than Van Tillberg and preferred Bass for the Van Cleve engagement; however, he replaced Bass with Van Tillberg.

16. Respondent Taylor, as booking agent for the Lamplighters and for complainant Bass, knew of Bass' qualifications and that he could perform "commercial society" music.

17. Respondent Taylor was of the impression, in March 1961, that the Van Cleve Hotel did not desire any Negro musician performing in its public rooms.

18. Respondent Taylor contributed substantially and materially to the replacement of Lester Bass, a Negro, by Tommy Van Tillberg, a white musician, and refused to refer Bass for this job because of Bass' race and color.

19. On March 10, Hoppel called Taylor to advise that Van Tillberg desired to be released to accept another job, and asked for an appointment for Bass, Kelly and himself, for the dual

purpose of finding employment foɪ Kelly and Bass and of finding a bass violin player to replace Van Tillberg as a member of the Lamplighters.

20. Hoppel, together with Bass and Kelly, came to Taylor's home (which serves as Taylor's office) about 1:30 p. m. or 2:00 p. m. on March 10 and remained about two hours. During this conference, Taylor attempted to place Bass and Kelly with a number of band-leaders and club owners and Taylor suggested that Hoppel call Berny Edwards, an orchestra leader, regarding the availability of his substitute bass violin player. Hoppel did so and found that the substitute, John Mapp, a white musician, was available.

21. On the evening of March 10, Mapp and David Schierloh, a white percussionist, "sat in" for a 40 minute audition with the Lamplighters at the Wishing Well, when the type of music played was "commercial jazz," and not "commercial society," the type of music required by the Van Cleve Hotel, and were promptly hired for the Van Cleve engagement.

22. Hoppel rated Bass a better bass violin player than Mapp.

23. Hoppel told Mapp and Schierloh that Bass could not be used at the Van Cleve because of his race and color.

24. Respondent Taylor refused and failed to refer complainant Bass for the opening resulting from Van Tillberg's withdrawal from the Lamplighters because of Bass' race and color and Taylor's understanding that the Van Cleve would not accept Negro musicians in its public rooms.

25. The evidence does not show that respondent Van Cleve Hotel Company requested Taylor or Hoppel to replace complainant Bass as a member of the Lamplighters during the engagement at the Van Cleve Hotel or stated to Taylor or Hoppel that the Ven Cleve did not desire any negro musician in its public rooms.

26. Complainant Bass was unemployed for the duration of the engagement of the Lamplighters at the Van Cleve Hotel, from March 13 through March 26, 1961.

27. John Mapp, the replacement for complainant Bass during the Lamplighters' engagement at the Van Cleve Hotel, was paid $90 per week or a total of $180.

## Conclusions of Law

1. Respondent Taylor is an employment agency within the meaning of FEPA.

2. Respondent Taylor referred the Lamplighters to the Van Cleve Hotel, Lester Bass having been excluded therefrom because of race and color, and did refuse or fail to refer complainant Bass for employment with the Lamplighters during the engagement at the Van Cleve Hotel because of Bass' race and color, in violation of Section 4112.02 (B), Revised Code.

3. The evidence does not establish that respondent Van Cleve Hotel Company did, in connection with the engagement of the Lamplighters at the Van Cleve Hotel, engage in any unlawful discriminatory practice.

## Recommendations

1. It is recommended that the complaint against the respondent Van Cleve Hotel Company in case No. 1 before the Ohio Civil Rights Commission be dismissed.

2. It is recommended that the Commission issue an order to respondent Karl Taylor, dba Karl Taylor Orchestras and Entertainment in Case No. 1 before the Ohio Civil Rights Commission providing, in substance, as follows:

IT IS HEREBY ORDERED that respondent Karl Taylor pay to complainant Lester Bass $180 (plus interest at the legal rate), the amount of the salary to which he would have been entitled had he been permitted to perform with the Lamplighters during the engagement at the Van Cleve Hotel.

IT IS FURTHER ORDERED that respondent Karl Taylor forthwith cease and desist from discriminating against any person on the basis of race, color, national origin or ancestry in the acceptance, registration, classification or referral of persons for employment, or otherwise discriminating against any person contrary to the Ohio Fair Employment Practices Act.

Roscoe L. Barrow
HEARING EXAMINER